JOSEPH TELFORD *et al.*

*v.*

JAMES F. HOWELL, Exr.

*Opinion filed February 21, 1906.*

1. ACTIONS AND DEFENSES—*complete change of defense on second trial is a suspicious circumstance.* Abandonment by the defendant to a foreclosure proceeding of the defense made on the first hearing, and the advancement by him, on amended pleadings, of an entirely new defense based on facts of which he should have been cognizant at the time of the first hearing, is a suspicious circumstance calling for careful examination of the facts under which the new defense is advanced.

2. EVIDENCE—*chancellor's determination as to the credibility of witnesses not lightly disregarded.* Arbitrary rejection by the chancellor of the testimony of unimpeached witnesses is not permissible, but where a cause is heard on the oral testimony of witnesses in open court it is the province of the chancellor to determine the question of their credibility and the weight to be given their testimony, and his determination in that regard will not be lightly disregarded by a court of review.

3. SAME—*what evidence is not admissible in foreclosure.* On foreclosure by the personal representative of the mortgagee, where a witness has testified that the defendant had made the statement

that he was trying to borrow a certain amount of money to pay the mortgage indebtedness, the defendant, under the guise of giving his version of that conversation, cannot be permitted to state his conclusion as to what he considered he was owing on the mortgage at that time, and thus indirectly testify as to alleged payments claimed by him to have been made to the mortgagee before his death but not credited on the note.

4. SAME—*declarations in one's own interest are not admissible.* If the defense to a foreclosure suit begun by the mortgagee's executor is a reduction of the amount due by an alleged settlement with the mortgagee before his death, evidence of declarations made by the defendant after the alleged settlement tending to show that the amount due on the mortgage had been reduced are declarations in his own interest and are not admissible.

APPEAL from the Appellate Court for the Fourth District;—heard in that court on appeal from the Circuit Court of Marion county; the Hon. W. M. FARMER, Judge, presiding.

W. F. BUNDY, for appellants.

CHARLES H. HOLT, FRANK F. NOLEMAN, and L. M. KAGY, for appellee.

Mr. JUSTICE SCOTT delivered the opinion of the court:

On May 7, 1890, Joseph Telford and wife, the appellants, executed and delivered to James H. Gray their principal note for $9000, payable five years after its date, and bearing interest at the rate of seven per cent per annum, payable semi-annually, and having attached thereto ten interest notes for $315 each, representing the several installments of semi-annual interest. To secure this note the makers executed and delivered to James H. Gray a mortgage on a large tract of real estate. The first three interest notes were detached from the principal note and were undoubtedly paid. After the death of James H. Gray, on October 25, 1901, the principal note, with the remaining seven interest

notes attached thereto, and the mortgage, came regularly
into the hands of the appellee as the property of Gray's es-
tate, and a bill was filed by the appellee in the circuit court
of Marion county to foreclose the mortgage for the full
amount of the principal and the seven interest notes. There
was no endorsement of payment on the principal or any of
the interest notes. Appellants answered the bill, alleging
payment in full in the lifetime of James H. Gray, and set-
ting forth specifically the dates and amounts of the twelve
payments relied upon, running from February 16, 1893, to
February 19, 1900, and amounting, in the aggregate, accord-
ing to the allegations of the answer, to the full amount due
on the principal and interest notes. Among the payments
so specifically alleged is one for $4289.58, made by check
dated October 24 but delivered October 28, 1898.

Upon the issues formed by the bill and answer the cause
was heard at the April term of the circuit court, 1902, and
a decree was rendered foreclosing the mortgage, without
the allowance of any credit or payment upon the indebted-
ness. Afterwards an application was made for a rehearing
on the ground of newly discovered evidence, being the testi-
mony of the witness Jackson and the witness E. C. Telford,
son of appellants, to an alleged settlement between Joseph
Telford and James H. Gray on October 28, 1898, at which
time a check for the said sum of $4289.58 was delivered by
Joseph Telford to James H. Gray, and at which time, ac-
cording to the testimony of these witnesses, it was stated or
determined by the parties that the amount due on the mort-
gage was reduced to $4000 after the delivery of this check.
A rehearing was granted upon this application. After-
wards the answer was amended by striking out all allegations
of specific payments except that of the check, and by insert-
ing therein a general allegation that Joseph Telford had
made payments on the mortgage indebtedness from the fall
of 1890 to October 28, 1898, and that on the latter date he
made a settlement with James H. Gray, in which the total

amount due on the mortgage indebtedness was found to be
$8289.58; that a payment of $4289.58 was made at that
time, leaving a balance of $4000 due, as determined between
the parties, and that after that time different amounts were
paid until the whole amount of the mortgage indebtedness
was discharged. Upon the issues made by the bill and
amended answer the cause was heard again, and a decree
of foreclosure was rendered for the sum of $18,464.73, the
full amount due upon the face of the principal and seven
interest notes. This decree has been affirmed by the Appel-
late Court for the Fourth District, and the cause is now be-
fore us on appeal from that judgment of affirmance.

Upon the hearing no evidence of any specific payment
was offered by the appellants except the check dated October
24, 1898. There was affirmative evidence on the part of the
appellee, however, to show that the specific payments set up
in the former answer, except that represented by the check
in question, were payments on other obligations than the
mortgage indebtedness, and there was evidence tending to
show that the payment represented by the check was in settle-
ment of a deal in cattle between Joseph Telford and James
H. Gray, and not a payment on the mortgage indebtedness.

It is true that there was evidence of statements of James
H. Gray tending to show that the mortgage indebtedness
had been greatly reduced, but it is also true that there was
evidence of statements of Joseph Telford tending to show
the contrary. But these statements were too indefinite to
be made the basis of a decree. The important question
presented for consideration relates to the sufficiency of the
testimony of Jackson and E. C. Telford to establish the set-
tlement and payment alleged to have been made on Octo-
ber 28, 1898.

Jackson testified that at the time of the alleged settle-
ment he went to Joseph Telford's home to collect an amount
due him for labor, and that when he went into the room and
took a seat Joseph Telford and James H. Gray were in the

·act of settling; that Telford had a check for "forty-two hundred and something," and read it aloud at Gray's request; that Gray told Telford that if he should do as well the next year as he had in the past year he would have it all paid off, and that the check would leave even money ($4000) on the mortgage loan. This witness further testified that when he went into the room Telford seemed to be figuring, but that Gray "added it up in his head" and "spoke out and said what it was," and that Telford "accepted." There were many papers on the table, but the witness could not say whether the note and mortgage were there or not. This witness did not hear anything said about interest or coupons. He did not hear Telford ask for a receipt or to have the coupon detached and surrendered. There was evidence to the effect that Gray was an expert in mental arithmetic, and made his business calculations without the use of pen or pencil.

E. C. Telford, aged twenty-one, son of the appellants, testified that he was present during part of the conversation in question; that his father would figure a little, and that Gray, who seemed to know just what it was without figuring, would then say, "Yes, that is all right;" that his father said he wanted to pay enough to leave even $4000; that he wrote the check, read it over and handed it to Gray, and that Gray said, "That is all right; now, if you do as well on your cattle next year as you have this year you will pay it all off easily enough." The witness further testified that they were figuring on the mortgage loan on the farm; that he did not remember what items of indebtedness or credits were figured in; that other deals were figured in the settlement; that his father had been pasturing cattle for Gray, and that they figured something of that kind and talked about cattle and interest.

But it is a significant fact that Jackson and E. C. Telford were not witnesses on the first hearing and that no settlement was at that time relied upon or asserted. On the first

hearing the appellants set out to make defense by proving twelve specific payments, covering a period of seven or eight years, specifying in their answer the dates and amounts, such payments including the check for $4289.58. If these payments had been proved as alleged they would have constituted a complete defense. But the chancellor held the payments not proved, and thereupon the appellants proceeded to shift their ground of defense, abandoning all allegation or attempt at proof of specific payments except the one check above mentioned, and relying entirely, on the second hearing, on proof of a settlement not mentioned in the original answer and no evidence of which was offered on the first hearing.

E. C. Telford undertakes to explain his tardiness in divulging his knowledge of the alleged settlement. He admits that he knew his father was making defense in the foreclosure suit at the time of the first hearing, but says he did not know how much the foreclosure suit was for, or that there was a dispute as to the amount, or that it was claimed there were no credits on the note, or that his father claimed payments on the indebtedness. He says he remembered all the time that he was there when the settlement was made, and then admits that he did not say a word to his father about being present until after the first trial, and that his father did not ask him anything on the subject.

The witness Jackson, who had worked for Joseph Telford from time to time for a number of years and had been a witness for him in a number of lawsuits, testifies that he did not hear of the foreclosure suit until after the first hearing; that his memory was then refreshed by hearing people talking about the judgment being against Joseph Telford, and that he then told Telford about the settlement, whereupon Telford remarked that he believed it was too late, meaning, undoubtedly, too late to use the information.

It was after this that the answer was amended and the ground of defense shifted, as has already been shown.

While it is true that pleadings may be amended, varying the statement of the cause of action or ground of defense so as to make the same conform to the real facts as developed or ascertained in the progress of the litigation, yet it is also true that a radical change in the pleadings as to those facts of which the party making the amendment must all the time have had personal cognizance, is calculated to arouse suspicion and to call for a careful examination of the circumstances under which the new theory of the case is thus advanced.

And in so important a matter as the alleged settlement of this case it is strange, indeed, that Joseph Telford should have overlooked the fact that his own son and the witness Jackson were present, or that the son should have been so indifferent to the result of the foreclosure suit as not even to ask his father what the questions in controversy were.

While it is true that the testimony of unimpeached witnesses cannot be arbitrarily rejected, yet it is also true that where a cause is heard upon the testimony of witnesses in open court, it is the province of the chancellor, who sees and hears the witnesses, to determine the question of their credibility and of the weight which should be given their testimony. In such case the judgment of the chancellor will not be lightly disregarded. After a careful examination of the whole record we are unable to say that the chancellor erred in rendering a decree of foreclosure for the amount due upon the face of the principal and seven interest notes.

There are certain criticisms of the rulings of the chancellor in admitting and excluding evidence which require attention.

It is urged that it was error to admit in evidence certain bank books offered by the appellee, showing dealings between Joseph Telford and James H. Gray from time to time; but it is sufficient to say on this point that even if the bank books were not proper evidence there was sufficient evidence without these entries to justify the decree, in which case it

is to be presumed that the chancellor disregarded the entries in the decision of the case.

Upon the trial one W. C. Ingram and his wife testified to a conversation with Joseph Telford in March, 1902, in which he said he had been trying to borrow money with which to pay the mortgage indebtedness; that he had been offered $15,000, but that it would take $2000 or $3000 more. Joseph Telford was permitted to testify as to this conversation in rebuttal, and testified that what he did say was that he wanted to get $20,000 on the farm, consolidate his debts and get a less rate of interest. Thereupon his solicitor asked him this question: "How much money did you need at that time, and for what purpose?"

This question called for a mere conclusion of the witness. To have permitted him to answer would have been the same as permitting him to state, as a conclusion, how much he owed on the mortgage. It would have been to permit him, in effect, to testify to the alleged payments made before Gray's death. What cannot be allowed by direct question cannot be allowed through a skillfully framed indirect interrogatory.

This question was followed by an offer of proof equally objectionable,—that is, to show that, at the time of the conversation with Ingram, Telford was desirous of paying the Gray mortgage and of obtaining a loan for the purpose of paying certain specified obligations, among them, $5000 to the Gray estate, which he considered was due at that time. This was an offer to prove a thought or a desire, and the purpose of it was to have Telford testify, in effect, that in Gray's lifetime he had made payments on the mortgage indebtedness until he considered the amount owing had been reduced to $5000. The plain provision of the statute closing Telford's mouth as to the payments made in Gray's lifetime cannot be set aside under pretense of permitting Telford to testify to statements corroborative of his version of the conversation with W. C. Ingram.

James F. Howell, the appellee, testified to the sale of cattle, in 1897, by himself and James H. Gray to Joseph Telford, as tending to show that the check for $4289.58 was in payment for these cattle and not a payment on the mortgage indebtedness. This witness states that nothing was paid down on the cattle, referring to the time when the sale was made, and afterward states that he does not know how or when the cattle were paid for. Now Joseph Telford was a competent witness as to what occurred at the sale, but not as to what occurred during the six weeks intervening between the sale and the time when the cattle were removed by Telford from Gray's pasture. Hence the court properly refused to permit Joseph Telford to testify as to an alleged payment made after the deal was closed in Gray's pasture and before the cattle were taken to Telford's pasture, no conversation or transaction occurring during those six weeks having been given in evidence on the part of the appellee.

Thereupon Joseph Telford testified that he had heard the testimony of appellee that no money had been paid on this joint lot of cattle, and the witness was then asked to state whether or not this was true. The question was objectionable, not only on the ground above indicated, but also as improperly assuming that James F. Howell had sworn, generally, that no money was paid when he had simply sworn that no money was paid down, and also as assuming that Howell had sworn that this was a joint lot of cattle, whereas he had testified to a sale of his interest to Gray and that Telford was to pay Gray the entire purchase money.

An offer was made to prove by the witness Stonecipher that six or seven weeks before the April term of court, 1902, Joseph Telford had endeavored to borrow $20,000, of which the sum of $10,000 was to be applied in payment of a bank loan and $5000 to an account due Rice Bros., of Chicago. Presumably it was intended to draw an inference from such testimony that what was left of the $20,000 was to be paid in extinguishment of the mortgage indebtedness. The evi-

dence offered was not in rebuttal of any specific evidence, and was objectionable as being necessarily based upon declarations of Joseph Telford made out of court in his own interest.

There being no substantial error in the record the judgment of the Appellate Court is affirmed.

*Judgment affirmed.*